**Thomas PEPERISSA**

v.

**COREN–INDIK, INC.**

**Civ. A. No. 36474.**

United States District Court
E. D. Pennsylvania.

March 18, 1969.

Edward Rosenberg, Philadelphia, Pa., for plaintiff.

John Francis Gough, Philadelphia, Pa., for defendant.

### FINDINGS OF FACT

MASTERSON, District Judge.

1. Plaintiff, Thomas Peperissa, is a citizen of the State of Pennsylvania, residing at 7943 Provident Street in Philadelphia, Pennsylvania, and is a fifty-one year old mechanic experienced in the skill of repairing and maintaining machinery used in the manufacturing of textiles.

2. Defendant, Coren-Indik, Inc., hereafter referred to as Coren-Indik, is a corporation organized under and existing by virtue of the laws of the State of Pennsylvania, and having its principal place of business at 4224 N. Front Street, Philadelphia, Pennsylvania.

3. On September 9, 1964, plaintiff filed this action pursuant to the provisions of Section 216(b) of the Fair Labor Standards Act of 1938, as amended (Title 29 U.S.C.A. § 216(b)) to recover unpaid

overtime compensation allegedly due him from Coren-Indik, his former employer, for the period from February 9, 1962, to January 24, 1964.

4. Since its inception in 1957 to the present time, including all times relevant to this suit, Coren-Indik has been engaged in the manufacture of textiles.

5. There are at least three separate processes involved in Coren-Indik's manufacture of textiles: (a) picking and blending process, (b) carding process, and (c) spinning process. The carding process is a separate and distinct process from the other two processes, carried on in a separate room, customarily referred to as the "Card Room", by a specific unit of men with permanent status and function and involving the use of machines at least five feet wide and fifty feet long known as "cards".

6. From 1957 until March, 1963, Coren-Indik's plant was located on Third Street in Philadelphia, Pennsylvania, and included a separate area which was designated as the "Card Room". See Exhibit, D–1.

7. Starting in March, 1963, Coren-Indik began moving its plant from the Third Street location to a new location at 4424 N. Front Street, Philadelphia, Pennsylvania; an operation which was completed in late November, 1963.

8. In the plant at 4224 N. Front Street used by Coren-Indik from November, 1963 until the last date relevant to this suit, there was a separate area designated as the "Card Room". See, Exhibit, D–2.

9. During the time relevant to this suit Coren-Indik regularly and ordinarily operated six days a week. Occasionally, but only infrequently, would the plant operate for a five or seven day week.

10. There were three shifts of operations: the "A" shift from 7:00 A.M. to 3:00 P.M., the "B" shift from 3:00 P.M. to 11:00 P.M., and the "C" shift from 11:00 P.M. to 7:00 A.M. The record does not indicate whether all three shifts operated in the course of an ordinary day.

11. At all times relevant to this suit the president of Coren-Indik was Mr. Mark Indik and the Superintendent of the Plant was Mr. John Marselis.

12. Mr. Marselis was the general supervisor in charge of operations, both when the plant was located at Third Street and when the plant was located at Front Street. He had the primary responsibility for coordinating the processes involved in the manufacturing of textiles and for hiring and firing all plant employees.

13. Some time in the early part of 1957 the plaintiff was hired by Mr. Marselis to work for Coren-Indik. He remained in the latter's employ from then until January, 1964, and at all times during his employment he was engaged in the production of goods for interstate commerce.

14. From the time when he was hired until July, 1960, the plaintiff worked on Shift "A" as a foreman repairing and setting up various machines. During this time he was paid at an hourly rate of $2.40 and at times drew a weekly salary of as much as $150.00. During this time he received job assignments from a Mr. Allen who occupied the position designated as "Head Carder" (sometimes referred to as "Boss Carder"). See, Exhibit, D–3.

15. As Head Carder Mr. Allen was generally in charge of the Card Room during the A shift. He received instructions daily from Mr. Marselis and his supervision of the carding operation involved adjusting and setting up the cards, making sure that the employees in the Card Room were working properly, and, in sum, generally assuring that the production required by Mr. Marselis' instructions was performed.

16. Under Mr. Allen's authority there were always at least three, and possibly four, men: two or three "card feeders", each of whom operated two of the six cards which were located in the Card Room, and the plaintiff, who acted as a combination foreman-repairman. See, Exhibit D–3.

17. Some time in July, 1960, Mr. Allen terminated his employment with Coren-Indik and, shortly thereafter, Mr. Marselis informed the plaintiff that he was to fill Mr. Allen's position as Head Carder.

18. From July, 1960 until January, 1964, the plaintiff occupied the position of Head Carder. During this time he performed those tasks previously performed by Mr. Allen. He continued to devote a significant portion of his time, however, to the mechanical repair work which he previously had done. Unlike Mr. Allen the plaintiff did exercise a limited amount of authority over questions of hiring and firing subordinate employees. The final decisions in this area, however, as in all other areas, were made by Mr. Marselis, and essentially the plaintiff's job was to insure that Mr. Marselis' instructions were performed insofar as the carding process was involved.

19. After the plaintiff was made Head Carder no one was named as Foreman on the "A" Shift to replace him, and during his tenure as Head Carder plaintiff acted also as Foreman on the "A" Shift. Unlike the foremen on the "B" and "C" shifts he was salaried.

20. Although the plaintiff worked primarily during the "A" Shift he was called in on emergency occasions to work on the other two shifts because his mechanical knowledge was greater than that of the other foremen. The average amount of time per week which the plaintiff worked on these shifts, however, was not significantly greater than the amount of time he had worked on these shifts prior to July, 1960.

21. Throughout the period from July 1960, until March, 1963, the plaintiff, as Head Carder, essentially performed the same sort of labors. During this period he was in charge of the work of at least three card-feeders.

22. From March, 1963, until November, 1963, the plaintiff, though still acting as Head Carder, exercised somewhat greater authority over the operations of the Card Room at the Third Street plant, since Coren-Indik was moving its entire operation to a new plant. Significant decision-making was still carried on by Mr. Marselis who maintained constant contact with the plaintiff. During this period the plaintiff also worked as a mechanic an appreciable amount of time, moving and setting up machinery in the new plant.

23. From November, 1963, until the termination of his employment with Coren-Indik in January, 1964, the plaintiff was Head Carder of the Card Room in the new Front Street plant. His responsibilities essentially remained the same as those he previously had at the Third Street plant, although now he had authority over at least four card feeders, in that there were eight cards in the new plant, and, at least in the last few weeks before the termination of his employment, he also had authority over three fixers who were mechanics responsible for assisting the card-feeders when the cards broke down.

24. From July, 1960, until January, 1964, the plaintiff was employed on a weekly salary basis which initially was $170.00 a week and ultimately was $185.00 a week. During this period the plaintiff worked on occasional Sundays for which he was compensated initially at the rate of $20.00 a day, and later at the rate of $25.00 a day.

25. Although from September 9, 1962, to January 26, 1964, the plaintiff was employed on a weekly salary basis, for purposes of determining the amount of overtime compensation to which he was allegedly entitled it is essential to find as a fact what his hourly rate of compensation was and the number of overtime hours he worked:

a) from September 9, 1962 to December 31, 1962 the plaintiff was paid at the rate of $3.75 an hour and he worked 192 overtime hours;

b) from January 1, 1963 to September 8, 1963, the plaintiff was paid at the rate of $3.75 an hour, he worked 336

overtime hours, and he received overtime premiums amounting to $200.00; and,

c) from September 9, 1963, to January 26, 1964, the plaintiff was paid at the rate of $3.88 an hour and he worked 128 overtime hours.

## CONCLUSIONS OF LAW

1. This Court has subject-matter and personal jurisdiction of this action pursuant to the provisions of the Fair Labor Standards Act of 1938, as amended, found at Title 29 U.S.C.A. § 201 et seq., particularly § 216(b).

2. Plaintiff's claim for overtime compensation for hours worked prior to September 9, 1962, is barred by the two-year Statute of Limitations contained in the Portal-to-Portal Act of May 14, 1947, as amended, found in Title 29 U.S.C.A. § 255.

3. During the time he was employed as Head Carder for the defendant Coren-Indik, from September 9, 1962, to January 26, 1964, plaintiff did not receive compensation for work performed during overtime periods in compliance with the provisions of the Fair Labor Standard Act, Title 29 U.S.C.A. § 207.

4. The defendant's contention that the plaintiff was employed between September 9, 1962, and January 26, 1964, in a *bona fide* executive capacity so as to be exempt from the provisions of the Fair Labor Standards Act is not correct and, on the contrary, the evidence indicates that throughout this period the plaintiff was employed as a foreman entitled to overtime benefits established under the Fair Labor Standards Act.

There are two standards by which the defendant's claim theoretically could have been determined, i. e. the "short test", and the "long test". In employing the "long test" a court can decide that an employee is an executive exempt from the Act's coverage only if the conditions of the employee's employment are such as to satisfy the perquisites established in that test, i. e. that the employee's " * * * primary duty consists of the management of the enter-prise * * * ", that he " * * * customarily and regularly directs the work of two or more other employees * * ", that he " * * * has the authority to hire or fire other employees * * * ", that he " * * * customarily and regularly exercises discretionary powers * * * ", that he " * * * does not devote more than 20 percent * * * of his hours of work in the workweek to activities not * * * (managerial in nature) * * * ", and, that he " * * * is compensated for his services on a salary basis at the rate of not less than $100 per week * * * " Title 29 C.F.R. § 541.1, pp. 102–103. If an employee, such as the plaintiff, is employed at a salary basis of not less than $150.00 per week, then his employer's contention that he is an exempt executive may be determined by use of the "short test" which requires only that the employee's " * * * primary duty consists of the management of the enterprise * * * and includes the customary and regular direction of the work of two or more employees * * * ", Ibid.

From September 9, 1962, to January 26, 1964 the plaintiff essentially was employed as a mechanic and hence his alleged executive status can not properly be determined by use of the "short test". See, Title 29 C.F.R. § 541.119(b), p. 117, and Winkler v. Phenix Soda Fountain Co., Inc., 32 L.C. ¶ 70,677 (Supreme Court of New York, 1967). As measured by the "long test", however, the plaintiff's employment was not such as to satisfy the requirements contained in Title 29 C.F.R. § 541.1, particularly the requirements that he " * * * customarily and regularly exercises discretionary powers * * * " and that he " * * * does not devote more than 20 percent * * * of his hours of work in the workweek to activities not * * * (managerial in nature) * * * "

Although the plaintiff admittedly exercised authority over a limited number of subordinates, his employment peculiarly could be characterized as that of a " * * * working foreman * * " not considered exempt from the overtime

provisions of the Fair Labor Standards Act. See, Title 29 C.F.R. § 541.115, "Working Foremen", subsection (c) (2), p. 114, and Title 29 C.F.R. § 541.108(b), p. 109 ("(I)t should be borne in mind that it is one of the objectives of § 541.1 to exclude from the definition foremen who hold 'dual' or combination jobs."). Precedent involving employees exercising greater discretionary powers than this employee support the conclusion that he is not an exempt executive. See, Spring v. Washington Glass Co., 153 F.Supp. 312 (D.C., W.D.Pa., 1957), and Cramer v. Roman Iron Works, Inc., 53 L.C. ¶ 31,804 (N.Y, Supreme Court, 1966). Accordingly, the Court has concluded that at no time between September 9, 1962 and January 26, 1964, was the plaintiff employed in a *bona fide* executive capacity so as to be exempt from the provisions of the Fair Labor Standards Act.

5. As compensation for overtime work performed between September 9, 1962 and January 26, 1964, plaintiff is entitled to recover an amount resulting from the multiplication of 1 and ½ times his regular hourly rate times his overtime hours minus overtime premiums he already has received. See, e. g. Moretti v. Boogers, 376 F.2d 27, 28 (C.A.5, 1967), and Hayes v. Bill Haley and His Comets, Inc., 274 F.Supp. 34, 36–37 (E.D.Pa., 1967). Based on fact-finding 25, the plaintiff therefore is entitled to recover compensation for overtime work in the amount of $3517.60.

6. Because plaintiff's employment was of a border-line nature between exempt executive and non-exempt employee labor, and because the defendant had reasonable grounds to believe that the plaintiff was not entitled to extra compensation for work performed during overtime periods the plaintiff will not be awarded any amount of liquidated damages. See, e. g. Scarmato v. Northern California Thrift Co., 184 F.Supp. 420, 423 (N.D.Calif., 1960).