Peter A. SACK, Plaintiff,

v.

**MIAMI HELICOPTER SERVICE, INC., a Florida corporation, Defendant.**

No. 96–2892–CIV.

United States District Court, S.D. Florida.

Nov. 14, 1997.

Robert E. Weisberg, Coral Gables, FL, for Plaintiff.

Neil Flaxman, Coral Gables, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, Senior District Judge.

THIS CAUSE was tried before the undersigned without a jury on March 11, 1997. Having reviewed the various documents and other items submitted as evidence, having heard and considered the testimony of the witnesses and the arguments of the parties at trial, and, further, having reviewed the pertinent exhibits and post-trial submissions, the Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

### BACKGROUND

This action was filed by Peter A. Sack (hereinafter "Sack") against his former employer Miami Helicopter Service, Inc. (hereinafter "Miami Helicopter"), on October 16, 1996, alleging that Miami Helicopter violated the Fair Labor Standards Act (hereinafter "FLSA"), as amended, 29 U.S.C. § 201 *et seq.* Plaintiff specifically charges that Miami Helicopter violated FLSA overtime provisions by failing to pay him overtime compensation in the amount of one and one-half times his hourly rate for hours worked in excess of forty (40) hours each week. In addition to his claim for overtime pay in the amount of $10,543, Plaintiff asserts a claim for damages and attorney's fees. Defendant, in its Answer, claims that at all relevant times the Plaintiff was a bona fide executive

and/or administrative employee, and therefore was exempt from the overtime provisions of FLSA.

## I. FINDINGS OF FACT

1. Miami Helicopter is a corporation of the State of Florida engaged in interstate commerce, which handles, sells, or works on goods that have been moved in or produced for such commerce. *Joint Pretrial Stipulation* (hereinafter "Stipulation"), § VI, ¶ 4.

2. At all times material hereto, Miami Helicopter had annual gross sales in excess of five hundred thousand dollars ($500,000). *Stipulation*, § VI, ¶ 6.

3. During the time that Sack was employed at Miami Helicopter, the company employed between 10 and 13 employees. *Trial Testimony* (Di Gregorio).

4. Sack was employed by Miami Helicopter from October 1994 through August 14, 1996. *Stipulation*, § VI, ¶ 2,3.

5. The parties stipulated prior to trial that Sack's regular hourly rate of compensation throughout his employment with Defendant was $18.75 per hour. *Stipulation*, § VI, ¶ 9. At trial, the testimony revealed that Sack received one thousand one hundred and forty dollars ($1140) in *net* income every two weeks during his employment. *Stipulated at Trial.*[1]

6. With the exception of a brief period at the beginning of Sack's employment, Sack was considered to be a salaried employee. *Trial Testimony* (DiGregorio). Sack and Di Gregorio (President of Miami Helicopter) were the only salaried employees at Miami Helicopter. *Id.*

7. Throughout his employment with Defendant, Plaintiff punched in and out on a time clock, which recorded the number of hours he worked. *Stipulation*, § VI, ¶ 13. Sack's time cards were reviewed and approved by his "supervisee," Ramiro Campo. *Trial Testimony* (Sack, Campo).

8. Sack was paid overtime only for a three week period at the beginning of his employment. *Trial Testimony* (Sack). Sack worked a total of at least 374.8 hours in excess of forty (40) hours per week for which he was not paid overtime. *Stipulation*, § VI, ¶ 8.

9. One and one-half times Sack's regular hourly rate of compensation is $28.13 per hour. *Stipulation*, § VI, ¶ 10. If Plaintiff is a non-exempt employee under the Fair Labor Standards Act, he is entitled to at least $10,543.12 (374.8 hours X $28.13 per hour =$10,543.12)[2] of unpaid overtime. *Stipulation*, § VI, ¶ 12.

10. Di Gregorio, the President of Miami Helicopter, was aware of certain policies and procedures required by the Fair Labor Standards Act, such as minimum salary and the maximum amount of hours an employee can work before overtime pay is required. Di Gregorio did not directly delegate responsibility for determinations of the application of the Fair Labor Standards Act to any other employees. *Trial Testimony* (Di Gregorio).

11. Ana Escauriza, controller and chief accountant for Miami Helicopter, was familiar with the Fair Labor Standards Act. *Trial Testimony* (Escauriza).

12. Di Gregorio was not aware of any policies or procedures which were in place at Miami Helicopter to insure that those employees who were entitled to overtime were paid overtime, and he consulted with no outside source to determine whether Sack was entitled to be paid overtime. *Trial Testimony* (Di Gregorio). The only "procedure" in place at Miami Helicopter to determine overtime eligibility was that which called for the controller to pay overtime at a rate of one and one half the regular hourly rate to all employees except the president of Miami Helicopter or the head of a department. Ana Escauriza did not consult any law or regulations in making her determinations re-

---

1. Mr. Flaxman stated "... I think we can stipulate that his net salary was $1140 every two weeks ..."

   Ms. Turner stated "There may have been one time [that a deduction was taken from Sack's salary] but I don't know exactly".

The Court: "$1140 was his net pay."

2. The Court notes the apparent mathematical error in the amount of 63 cents in the *Stipulation*.

garding overtime eligibility. *Trial Testimony* (Escauriza).

13. Ana Escauriza stopped paying Sack overtime when his status changed from a temporary employee to a permanent employee. *Trial Testimony* (Escauriza). Both Escauriza and Di Gregorio joined in the decision to discontinue paying Sack overtime. Di Gregorio based his decision to discontinue paying Sack overtime on the fact that the previous Director of Maintenance was not paid overtime, and because Sack had duties and responsibilities which would require him to stay longer on some days, whereas on other days he would have time for himself.[3] Di Gregorio didn't believe he was breaking any rules by not paying Sack overtime because the previous Director of Maintenance, with a tenure of ten years, had not been paid overtime. *Trial Testimony* (Di Gregorio). Sack testified as to his belief that the decision to discontinue the payment of overtime to him was due, in part, to the fact that Miami Helicopter couldn't afford to pay for the overtime. *Trial Testimony* (Sack).

Relative to Sack's job duties, the Court enters the following findings of fact.

### Hands On Mechanical Work

14. According to Sack, he spent 20% of his time doing "hands on" mechanical work. Art Grassia, a mechanic who was employed part time for a specific project at Miami Helicopter, testified that Sack assisted him doing mechanical work for 6–7 hours during an average 20 hour period (equivalent to 30–35% of hours worked by Grassia). Randy Riddle, another mechanic who was employed part time on a specific project at Miami Helicopter, testified that Sack assisted him doing mechanical work for approximately 1 hour out of each of his 4 hour shifts (equivalent to 25% of Riddle's work hours). Oscar Salinas, a mechanic's helper in the Maintenance Department at Miami Helicopter, testified that Sack only did mechanical work 1/2 to 1 hour per day (equivalent to no more than 12.5% of a regular workweek). Ramiro Campo, a mechanic from the Maintenance

Department at Miami Helicopter, stated that Sack did mechanical work a maximum of 2 hours per week (equivalent to 5% of a regular workweek); however, Campo admitted that Sack had done the complete repair work on a particular Robinson helicopter, and that Campo may not have been in a position to observe Sack at certain times when Sack was performing hands on mechanical work. DiGregorio testified that if Sack performed mechanical work for 10% of his time it would be an exaggeration. Taking the average of these varying estimates, and noting the testimony of the part time workers—who admittedly observed only a portion of Sack's workweek—in contrast to those current employees (and the potential interests of each party's witnesses) the Court infers that Sack performed hands on mechanical work for approximately 15% of his regular workweek. *Trial Testimony* (Sack, Grassia, Riddle, Salinas, Campo, Di Gregorio).

### Inspection Work

15. According to his testimony, Sack spent more than 50% of his time doing inspection work, which generally began with the opening of a work order. Opening a work order entails obtaining a work order number from a log and consulting with the customer to determine what work they wanted performed on the aircraft. After opening the work order, Sack planned the repair work for the job, ordered the required parts and materials, forwarded the work order to the mechanics, and directed the mechanic's work. At the completion of the work, Sack inspected each project. This inspection required that Sack perform visual examinations and take actual measurements using precision measuring devices according to manufacturer's specifications and Federal Aviation Administration (hereinafter "FAA") requirements. Sack obtained the specifications and requirements by consulting various manuals. He also confirmed that the pertinent paperwork (e.g. documentation of maintenance) complied with FAA requirements. In the event that

---

**3.** The Court notes that Sack was consistently paid the same salary for weeks when he worked less than 40 hours due to sick leave, holidays, vacation time or for unspecified reasons. *Trial Testimony* (Escauriza), *Plaintiff's Exhibit 3*, and *Defendant's Exhibit 17*.

an aircraft component or part was not in compliance, Sack was responsible for directing work to correct the problem. *Trial Testimony* (Sack).

### Personnel Management Duties

16. Sack was responsible for responding to employment inquiries for mechanic's positions received by Miami Helicopter, a function which occupied very little of his time. Generally, Sack sent out form letters explaining that Miami Helicopter was not hiring; but if he believed that a particular resume he received was interesting he would forward it to Di Gregorio for his consideration. On two occasions Sack interviewed and hired a part time temporary mechanic for a specific job after receiving authorization from Di Gregorio; no other mechanics were hired during Sack's tenure. *Trial Testimony* (Sack).

17. Sack had the authority to subcontract certain mechanical work, including paint and engine repair. *Trial Testimony* (Di Gregorio).

18. As Director of Maintenance, Sack supervised two employees, Oscar Salinas, who cleaned helicopters, delivered parts and assisted the mechanic, and Ramiro Campo, who did the majority of the "hands on" mechanical work and also signed Sack's time card. *Trial Testimony* (Sack, Salinas, Campo).

19. Salinas' compensation was $7 per hour, and he was eligible for and received overtime pay. Campo's compensation was $12 per hour, and he was eligible for and received overtime pay. *Trial Testimony* (Sack, Salinas, Campo).

20. Salinas and Campo communicate in Spanish—and Sack speaks only a little Spanish. The three men communicated with the assistance of hand motions or by asking someone else to translate. *Trial Testimony* (Sack, Campo, Salinas).

21. Both Campo and Salinas were employed at Miami Helicopter before Sack was hired. Sack did not have the authority to give either employee a raise, nor did he determine their work schedules. Sack did not keep their personnel files, but he did maintain their training records. *Trial Testimony* (Sack). There is conflicting testimony as to whether or not Sack could approve vacation time for Campo or Salinas. Sack claims that he never approved vacation time whereas Ana Escauriza, the controller for Miami Helicopter, claims that vacation time for Campo and Salinas was first approved by Sack. Following Sack's approval Escauriza handled the accounting aspects of their vacation time. Salinas testified:

> I have to communicate to Peter Sack that I am going on a vacation. After that, we do the procedure. There is approval of the vacations to which these things are communicated to Miss. Ana Escauriza.

*Trial Testimony* (Salinas). This Court finds that the granting of vacation time to Salinas and Campo was a shared responsibility of Sack and Ana Escauriza.

22. Sack was responsible for the day to day activities in the Maintenance Department, and for directing the employees in his department, although at times Di Gregorio instructed Salinas and Campo directly. *Trial Testimony* (Salinas).

23. Sack and Di Gregorio would meet several times each month to exchange ideas. Di Gregorio would implement some of the suggestions made by Sack. Occasionally, Di Gregorio would direct or supervise Sack. *Trial Testimony* (Di Gregorio).

### Miscellaneous Duties

24. 20% of Sack's time was spent organizing and maintaining the technical library required by the FAA. Maintenance of the library consisted of inserting updates received from the aircraft manufacturers and the FAA into loose-leaf manuals. The insertion points were specified on the updates. *Trial Testimony* (Sack).

25. When Sack first began working for Miami Helicopter, he spent approximately four (4) weeks revising Miami Helicopter's FAA Inspection Procedures Manual. He revised the manual according to an FAA procedures document which describes the requirements of the manual. Each page of the manual contains Di Gregorio's initials, presumably reflecting his approval. *Trial Testimony* (Sack), Defendant's Exhibit 11.

26. Sack also was in charge of the alcohol misuse program, an FAA requirement. This involved arranging for specific employees to have urine specimens submitted for testing. The decision as to which employee was to provide a urine specimen and when was determined by an outside agency. Sack spent less than 1% of his time at this task. *Trial Testimony* (Sack).

## II. CONCLUSIONS OF LAW [4]

1. This Court has jurisdiction over this action pursuant to 28 U.S .C. § 1331 and § 1337, and 29 U.S.C. § 216(b). Miami Helicopter is subject to FLSA. *Stipulation,* § VIII, ¶ 1.

2. The FLSA requires that non-exempt employees receive overtime pay at a rate not less than one and one half times the regular rate of pay for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). An exemption to the overtime requirement of 29 U.S.C. § 207(a)(1) is provided for any employee employed in a bona fide executive, administrative or professional capacity in 29 U.S.C. § 213(a). Under 29 U.S.C. § 213(a) Congress specified that terms such as bona fide, executive or administrative shall be delimited from time to time by regulations of the Secretary of Labor. Such regulations are found at 26 C.F.R. § 541.0 *et seq.*

3. In order to establish that an executive or administrative exemption applies, the employee must be compensated on a salary basis. 29 C.F.R. §§ 541.1(f), 541.2(e)(2). An employee is compensated on a salary basis "if under his employment agreement he regularly receives each pay period on a weekly or less frequent basis, a predetermined amount constituting all or a part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a). This explanation of salary basis applies to the definition of both executive and administrative positions. 29 C.F.R. § 541.212.

4. At all times material to this action, Sack received a consistent sum ($1140) in net income, biweekly. Therefore, this Court concludes that Sack was employed by Miami Helicopter on a salary basis.

5. The burden of proof for exempt status as an executive or administrator falls on the employer. *Wirtz v. C & P Shoe Corp.,* 336 F.2d 21, 28 (5th Cir.1964).[5]

6. It is well settled law that exemptions from FLSA are to be narrowly construed. *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959).

The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people.

*A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945). The Eleventh Circuit recently reaffirmed the principle that exemptions to the FLSA must be cautiously granted. *Nicholson v. World Business Network, Inc.,* 105 F.3d 1361, 1364 (11th Cir.1997)(holding that an employee's salary basis for determination of administrative exemption is based on actual salary, not employment contract, and that evidence supported special verdict finding employee exempt), *cert. denied,* —— U.S. ——, 118 S.Ct. 368, 139 L.Ed.2d 287.

The Court will first consider if Defendant has proven that Sack qualifies for an execu-

---

4. To the extent that any findings of fact constitute conclusions of law, they are hereby adopted as such; to the extent that any conclusions of law constitute findings of fact, they are so adopted.

5. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

tive exemption, then turn to a consideration of the administrative exemption.

### Executive Exemption

7. Applicability of the executive exemption is determined by applying either the "long test" specified in 29 C.F.R. § 541.1(a-e) or the "short test" found in 29 C.F.R. § 541.1(f). The long test is applicable to employees whose salary falls between $155 and $250 per week, whereas the short test is applicable to employees receiving more than $250 per week. 29 C.F.R. § 541.1(f). *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1143–1144 (3rd Cir.1983); *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1224 (5th Cir. 1990). Since Sack earns an equivalent weekly net salary of $570, the "short test" is applicable.

■ 8. In addition to the salary requirement, the "short test" defines a bona fide executive as an employee "whose primary duty consists of the management of the enterprise ... or of a customarily recognized department or subdivision ... and includes the customary and regular direction of the work of two or more other employees therein...." 29 C.F.R. § 541.1(f). The Court first will consider whether Sack's primary duty was management of the enterprise or a subdivision, and then turn to the question of whether Sack directed the work of two or more employees.

In order to determine if an employee's primary duty qualifies as management of the enterprise, all the facts of the particular case must be considered. As a *general* guideline, if an employee spends more than 50% of his time in management activities, management would be considered the employee's primary duty. However, 29 C.F.R. § 541.103, includes the caveat that "[t]ime alone, however, is not the sole test, and in situations where the employee does not spend over 50% of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors suggest such a conclusion." Pertinent factors to be considered include, but are not limited to: the relative importance of the employee's

managerial duties as compared with his other types of duties; the frequency with which the employee exercises discretionary power; the employee's relative freedom from supervision; and the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103.

In order to guide the determination of whether an activity qualifies as "management of the enterprise," the Secretary of Labor has provided a number of examples of management activities including:

— interviewing, selecting and training of employees,

— setting and adjusting employees' rates of pay and hours of work,

— directing employees' work,

— maintaining employees' production or sales records for use in supervision or control,

— appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in their status,

— handling employees' complaints and grievances and disciplining them when necessary,

— planning the work,

— determining the techniques to be used,

— apportioning the work among the workers,

— determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold,

— controlling the flow and distribution of materials or merchandise and supplies,

— providing for the safety of the men and the property.

29 C.F.R. § 541.102.

The Court now turns to an analysis of whether or not more than 50% of Sack's time was spent managing the enterprise or the maintenance department,[6] which, if it was,

---

**6.** Duties that qualify as management of an enterprise include management of a subdivision of the enterprise, or a customarily recognized department of the enterprise. 29 C.F.R. § 541.1(f).

would render Sack an executive employee and therefore exempt him from the overtime provisions of the FLSA.

9. Sack's time (15%, See Findings of Fact, ¶ 15) that was spent performing "hands on" mechanical work does not qualify as management activity. "Hands on" mechanical work is manual labor, which clearly falls outside of the management examples listed in 29 C.F.R. § 541.102(b). Specifically, "hands on" manual labor does not involve: personnel supervision, decisions and evaluations; safety determinations; and only indirectly does it involve determining the types of materials and tools required for production. *See* 29 C.F .R. § 541.102(b). This Court finds that Sack's time spent performing "hands on" mechanical work does not qualify as a management activity.

10. Twenty percent (20%) of Sack's time was spent organizing and maintaining an FAA required technical library (See Findings of Fact, ¶ 25). As this activity falls outside of the management of Miami Helicopter or its maintenance department, this Court finds that Sack's time spent performing maintenance of the library is not a management activity.

The Court now turns to an analysis of Sack's time spent doing inspection work. The Court will separate the inspection work and determine which, if any, aspects of the work qualify as management of either Miami Helicopter or the maintenance department.

11. Sack's inspection work began with opening a work order, as described in Findings of Fact, ¶ 16. This routinized activity is distinguishable from the management activities delineated in 29 C.F.R. § 541.102(b). As this activity does not involve any direction of employees or production decisions, this Court finds that the process of opening a work order does not qualify as a management activity.

12. After opening the work order the repair work for the job is planned; parts and materials required for the job are ordered, and the mechanics are directed as to what repair work is required. As both "planning the work," and "determining the type of materials, supplies … to be used…" are spe-cific examples of management activities listed in 29 C.F.R. § 541.102(b), these activities qualify as management functions. The supervision of one's employees is the paradigm of a management activity, and directing the mechanics on specific repairs comprises supervision.

13. After planning the work and directing the mechanics, Sack's inspection duties continued: he ascertained that the necessary paperwork complied with the FAA requirements; and reviewed manufacturer's specifications and other FAA requirements which entailed finding and copying the proper checklists from manuals. According to 29 C.F.R § 541.102(b), management activities include personnel supervision, decisions, and evaluations, safety determinations, and determinations of materials and supplies required for production. These examples clearly differentiate generic paperwork activities from the supervisory activities of management. The accumulation of paperwork, the determination of whether or not the paperwork complies with the FAA, and the review of the manufacturer's and the FAA's requirements do not qualify as management activity.

14. In addition to performing paperwork related duties Sack conducted inspections of aircraft and aircraft components according to the manufacturers' specifications. Sack physically measured parts to determine if they met specified tolerances using precision measuring instruments, and visually inspected parts for defects. Although these aspects of the inspection work involve critical safety procedures, these procedures are not for the safety of Sack's supervisees, rather they are to maintain production quality and assure that the customer has a safe aircraft or aircraft component. Under 29 C.F.R. § 541.102(b), work that "provid[es] for the safety of the [employees] and the [enterprise's] property" is considered management activities. As these physical inspections were for production purposes and not for the safety of employees, they fall outside of management duties of Miami Helicopter or the maintenance department.

15. This Court recognizes that inspection and examination work may fall into either

managerial or production (non-managerial) categories. In differentiating close cases the Court is cognizant of the clarification offered by the Secretary of Labor:

[I]t should be borne in mind that it is one of the objectives of 541.1 to exclude from the definition [of executives or management activity] foremen who hold 'dual' or combination jobs.... Thus, if work of this kind [inspecting and examining] takes up a large part of the employee's time it would be evidence that management of the department is not the primary duty of the employee, that such work is a production operation rather than a function directly and closely related to the supervisory or managerial duties....

29 C.F.R § 541.108(g). This Court finds that the physical inspection activity performed by Sack is not managerial in nature and as such does not support Defendant's assertion that Sack's primary duty was to serve as an executive.

■ 16. Sack's inspection work also included the determination of whether a part could be repaired or must be scrapped out and replaced, and the direction of any appropriate repair for defective parts or aircraft components completes the inspection process. *Trial Testimony* (Sack). The determination of whether a part must be repaired or replaced involves planning the work and determining the type of materials to be used. This determination falls within the definition of management as specified in 29 C.F.R § 541.102. Finally, directing employees to take the appropriate actions to remedy the defect qualifies as management, as an activity subsumed under the category of supervision of employees. This Court finds that the process of determining if a part could be repaired, and directing any appropriate repair for defective parts is a management activity.

17. Thus, Sack's managerial duties included: planning the job, determining and ordering the parts and materials, directing the mechanics, determining if a part may be repaired or must be replaced, and directing any appropriate repair for defective parts or aircraft components. Sack's non-managerial duties include: "hands on" mechanical work

maintaining the technical library, opening work orders, accumulating paperwork for orders, ascertaining that paperwork complies with the FAA, review of the manufacturer's and the FAA's requirements, actual visual inspections, and measuring parts with instruments. Although, given the testimony, it is difficult for the Court to determine precisely the amount of time spent among the various activities included in the inspection category, this Court concludes that the amount of time which Sack spent performing non-management activities exceeded 50%. For example, "hands on" mechanical work and maintenance of the library alone totaled 35% of Sack's work hours. Thus, the Defendant has not carried its burden as to the applicability of the executive exemption.

Even though Sack spent less than 50% of his time managing the enterprise, this finding is not determinative of his status. Under the "caveat" contained in 29 C.F.R. § 541.103, the Court must consider all the pertinent facts of Sack's employment including: the relative importance of the employee's managerial duties as compared with his other types of duties; the frequency with which the employee exercises discretionary power; the employee's relative freedom from supervision; and the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103.

18. Of particular significance to the consideration of Sack's managerial duties is my determination that Sack's actual visual and physical inspection work, which was certainly central to his position is a non-managerial duty. Since the burden of proof is on the employer, this Court cannot say that Sack's managerial duties are relatively more important than Sack's non-managerial duties.

19. According to 29 C.F.R. § 541.107, the exercise of discretionary powers requires an employee to utilize discretion normally and recurrently; this requirement is not met by the occasional exercise of discretionary powers. Although Sack uses discretion when he plans a job, orders materials, directs the mechanics, and determines the appropriate repair or replacement of defective parts, lit-

tle discretion is necessary to make a determination regarding a defective part or aircraft component, as the manufacturer may specify the action to be taken. *Trial Testimony* (Sack). Even if an activity requires considerable discretion, it does not necessarily qualify as a management activity. This Court determines that although the actual visual and physical inspections performed by Sack required the exercise of considerable discretion; these decisions do not qualify as a management activity.

20. There is no bright line to aid the Court in determining whether the frequency with which an employee exercises discretion rises to the level of "normally and recurrently" exercising discretion. 29 C.F.R. § 541.107(b). Not only is a determination of the frequency of the use of discretion elusive, but discretion itself is of a qualitative nature, and thus is applied in varying degrees depending upon the specific task, circumstances and employee. Further, many non-executive and nonadministrative employees frequently utilize discretion in the performance of their work. Nevertheless, this Court finds that Sack does exercise discretionary power on a regular basis in his inspection duties.

21. The Court now turns to a consideration of Sack's relative freedom from supervision. Sack, who was the head of the Maintenance Department, was generally unsupervised, and ran the department independently on a day to day basis. *Trial Testimony* (Di Gregorio, Sack). Sack occasionally received direct supervision from Di Gregorio, and Sack's weekly time cards were checked, added up and signed by his supervisee, Ramiro Campo. *Trial Testimony* (Escauriza, Campo, Sack). Besides Sack, Di Gregorio was the only other person at Miami Helicopter who was qualified to supervise the Maintenance Department. *Trial Testimony*, (Di Gregorio). Although Sack was occasionally supervised by Di Gregorio, and Miami Helicopter had the somewhat unusual practice of having a supervisee approve a supervisor's time cards, this Court finds that Sack was relatively free from supervision.

22. The next pertinent factor to be considered is the relation between Sack's salary and the wages paid other employees for the performance of similar nonexempt work. Sack's hourly pay is approximately two and one half (2½) times the hourly compensation rate of Oscar Salinas, a mechanic's assistant. However, the nonexempt (i.e. mechanical) work performed by Sack is not similar to the work performed by Salinas, whose work was limited to assisting a mechanic. Sack's regular hourly pay is approximately one and one half (1½) times the rate of mechanic, Ramiro Campo. Bearing in mind that Sack spent only 15% of his time performing "hands on" mechanical work, this Court finds that Sack was paid significantly more than a nonexempt employee for similar nonexempt work.

23. In addition to the four (4) pertinent factors listed under 29 C.F.R. § 541.103, the Court must consider other pertinent factors which would indicate executive or lack of executive function.[7] The authority to hire and fire is critical[8] in determining if an employee qualifies as an executive. The regulations state in part:

> [that] no employee ... can be considered as employed in a bona fide executive capacity unless he is directly concerned either with the hiring or the firing and other change of status of the employees under his supervision, whether by direct action or by recommendation to those to who [sic] the hiring and firing functions are delegated.

29 C.F.R. § 541.106. Sack did not have occasion to hire, fire or change the status of his two supervisees, Ramiro Campo and Oscar Salinas; however, since Campo signed Sack's time card, it is unclear whether Sack actually had the authority to recommend a change in Campo's or Salinas' status. Sack shared the authority to determine vacation time for Campo and Salinas with the Controller, Ana Escauriza. Sack did recommend the hiring of two part time mechanics to Di Gregorio,

---

7. Under the "time alone" caveat in 29 C.F.R. § 541.103, the four (4) pertinent factors listed are only *some* of the pertinent factors to be considered in a primary duty determination. *Id.*

8. In fact, this determination is fatal in the "long test" 29 C.F.R. § 541.1(a-e); the determination constitutes a pertinent factor for consideration in the "short test."

and that recommendation was adopted. In addition, Sack was responsible for answering employee inquiries for his department although the answers were usually form letters explaining that Miami Helicopter was not hiring any mechanics at that time. On several occasions when Sack found a particularly strong application, he would forward the application to Di Gregorio for consideration. This Court finds that although Sack was able to recommend the hiring of temporary employees, he had very limited authority over the two full time employees Ramiro Campo and Oscar Salinas.

24. In summary, Sack's time spent organizing the library (20%), and his time spent performing hands on mechanical work (15%) are not management activities. Sack's inspection work, which occupied more than 50% of his time, was a mixture of management and non-management activities. Of the inspection process, only planning the repair work for the job, determining if a part must be replaced or repaired, and directing employees to take the appropriate action on these parts and aircraft qualified as management activities. This Court has concluded that Sack's time spent performing management activities falls short of the 50% primary duty requirement. The required pertinent factor analysis did not alter this conclusion. The Court finds that Sack's managerial duties were not more important than his non-managerial duties, that Sack did not exercise discretionary power on a regular basis, and that he had limited authority to hire and fire. On the other hand, Sack was relatively free from supervision, and was paid significantly more for his "hands on" mechanical work than his supervisee mechanic, Ramiro Campo. Because the burden is on the employer to demonstrate that the employee is exempt from the overtime provisions of the FLSA, and because exemptions from the FLSA are to be narrowly construed, this Court finds that Sack does not qualify as an exempt executive employee of Miami Helicopter.

Having failed to meet the FLSA requirements as an exempt executive, the Court turns to a consideration of Sack's status as an administrator.

*Administrative Exemptions*

■ An employer may properly deny overtime compensation to an employee if he or she is an administrator, i.e. if the relevant criteria for an administrative position are met. Courts must apply either the "long test," specified in 29 C.F.R. § 541.2(a-e), or the "short test," found at 29 C.F.R. § 541.2(e)(2). *Atlanta Professional Firefighters Union v. City of Atlanta,* 920 F.2d 800 (11th Cir.1991). The burden of proving that an employee is exempt from the requirements of FLSA falls on the employer. *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995) (internal citations omitted).

The "short test" requires the employer to establish that an employee is:

(2) . . . compensated on a salary or fee basis at a rate of not less than $250 per week . . . and whose primary duty consists of the performance of work described in paragraph (a) of this section, which includes work requiring the exercise of discretion and independent judgment . . .

29 C.F.R. § 541.2(e)(2). The referenced paragraph (a) defines a bona fide administrative employee as:

(a) [an employee w]hose primary duty consists of either:

(a)(1) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers . . . .

29 C.F.R. § 541.2(a)(1).

25. As the salary requirements of the executive exemption are identical to the salary requirements of the administrative exemption, 29 C.F.R. §§ 541.1 and 541.2, and since the Court has previously determined that Sack meets the salary requirements of an executive position, he necessarily meets the salary requirements of an administrative position. Thus, the requirements of the first prong of the "short test" are met.

The Court now turns to the second prong of the administrative "short test," an analysis of whether or not Sack's primary duty was the performance of management activities. First, the Court will consider if Sack meets

the 50% primary duty test, then the Court will consider other pertinent factors which might create an exemption under the "short test."

The phrase "directly related to management policies or general business operations of his employer or his employer's customers" is defined in detail at 29 C.F.R. § 541.205(a-d). "[D]irectly related to management policies or general business operations" applies to those persons who perform work of substantial importance to the management or operation of the business or it's customers. 29 C.F.R. § 541.205(a). Section 541.205(b) lists examples of activities which qualify as "servicing" a business, which include, "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b).

Section 541.205(c) broadens the phrase "directly related" to include both those employees whose work affects the policy of the business and those employees whose responsibility it is to execute policies of the business or its subdivisions. Section 541.205(c)(1–5) describes a variety of activities which qualify or fail to qualify as "directly related to management policies or general business operations." For example, a bank cashier or a tax consultant would qualify, but a bank teller or a general clerical employee would not. The distinguishing feature is whether the work is of substantial importance to the management or operation of the business. However, although an employee's decisions may have significant financial consequences for an employer, e.g. an insurance inspector or an operator of very expensive equipment, these employees are not deemed to be performing work that is "directly related to management policies or general business operations." 29 C.F.R. § 541.205(c)(2).

Section 541.205(c)(3) recognizes the importance, in difficult cases, of considering the specific facts for a determination of whether or not an employee's work directly relates to management policies. For example, a personnel employee who functions as a clerk is not performing work that is directly related to management policies, whereas, a personnel employee who determines personnel policies affecting all the workers in a company clearly is. In close cases, the determination of whether an employee falls into the former or latter category is highly fact sensitive. 29 C.F.R. § 541.205(c)(3). Other examples of employees whose work is directly related to management policies or general business operations include ". . . advisory specialists and consultants of various kinds, credit managers, safety directors, claim agents and adjusters, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others." 29 C.F.R. § 541.205(c)(5). The administrative operations of a business are distinguished from production or sales work.

█ The Court's determination as to whether the administrative exemption applies is nearly identical to the analysis of whether the executive exemption applies. If 50% or more of an employee's time is spent performing administrative activities, then he qualifies for an administrative exemption. *Atlanta Professional Firefighters,* 920 F.2d at 805. If an employee spends less than 50% of his time performing administrative activities there are other pertinent factors listed at 29 C.F.R. § 541.103, which may lead to the conclusion that the employee was, nevertheless, an administrator.

█ Activities which qualify as administrative are the performance of office or nonmanual work directly related to management policies or general business operations of the employer or the employer's customers, which includes work requiring the exercise of discretion and independent judgement.[9]

9. In separate opinions, the Eighth and Ninth Circuits have determined that the requirements of an employee serving in a bona fide administrative capacity, under the "short test," include a weekly salary in excess of $250, and that the employee's primary duty simply include work which requires discretion and independent judg-

ment. *Dymond v. United States Postal Service,* 670 F.2d 93, 95 (8th Cir.1982); *O'Dell v. Alyeska Pipeline Service Co.,* 856 F.2d 1452, 1454 (9th Cir.1988). This Court observes that 29 C.F.R. § 541.2(e)(2) contains language that specifically refers to the additional requirement of 29 C.F.R. § 541.2(a)(1) which states that an administrative

26. Sack's time (20%) spent organizing and maintaining an FAA required technical library did not require the use of discretion or independent judgement and therefore does not qualify as an administrative activity. Nor does Sack's time (15%) that was spent performing hands on mechanical work qualify as an administrative activity, as it falls outside of management policies and general business operations which include the exercise of discretion and independent judgment. 29 C.F.R. §§ 541.206, 541.2(e)(2).

The Court now will consider the various aspects of the inspection process, and determine which, if any, qualify as an administrative activity.

27. Opening a work order initiates the repair of a customer's aircraft and, as such, is a part of Miami Helicopter's production work. Generally, production work is not directly related to management policies or general business operations. 29 C.F.R. § 541.205(a). Thus, this Court finds that Sack's time spent opening the work orders does not inure to the fifty percent (50%) primary duty requirement.

28. After opening the work order the repair work for the job is planned: parts and materials required for the job are ordered and the mechanics are directed as to what repair work is required. Under 29 C.F.R. § 541.205(c) an employee's activity may qualify as "directly related to management policies or general business operations" if it affects a segment of the business. Arguably, the purchase of parts, which is fundamental to the operation of the maintenance department, would be "directly related to management policies or general business operations" of Miami Helicopter. However, under this construction, any office worker that spends 50% of his or her time making purchases for their department would qualify as an exempt administrator—a result which would clearly violate the express intent of the FLSA. Although these tasks require the exercise of some discretion and independent judgment, the particular decisions regarding parts and employees are actually more akin to the use

of skilled decisions. Section 541.207(c)(1) specifically addresses this point:

Perhaps the most frequent cause of misapplication of the term "discretion and independent judgement" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

29 C.F.R. § 541.207(1). Thus, this work, which is an early stage in the repair or production work of Miami Helicopter, is not "directly related to management policies or general business operations." 29 C.F.R. § 541.205(a).

29. The determination of whether or not the pertinent paperwork complies with the F.A.A. requirements, and the review of the manufacturer's and the F.A.A.'s requirements are an integral part of the production at Miami Helicopter and, thus, do not directly relate to management policies or general business operations. This aspect of the inspection procedure is fairly routinized, and any discretion or independent judgment would be most accurately characterized as an application of skill. *See* 29 C.F.R. §§ 541.207(a), 541.207(c)(1), 541.207(c)(2).

Section 541.207(c)(2) specifically addresses the distinction between inspection and activities that use discretion and independent judgement.

A typical example of the application of skills and procedures [in contrast to discretion and independent judgment,] is ordinary inspection work of various kinds. In-

primary duty consists of "[t]he performance of office or non-manual work directly related to management policies or general business opera-

tions of his employer or his employer's customer...."

spectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors ' rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections ... but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards....

29 C.F.R. § 541.207(c)(2). This section describes, almost exactly, the activity performed by Sack. Accordingly, this Court finds that the actual visual and physical inspection of the aircraft and aircraft components does not qualify as being directly related to management policies or general business operations.

■ 30. The final procedure in the inspection process, directing the repair or replacement of parts which fail inspection, is part of the production process at Miami Helicopter, and as such does not qualify as an administrative operation of the business. 29 C.F.R. § 541.205(a).

31. Sack's activities at Miami Helicopter fail to meet the 50% primary duty test for an administrative exemption to be applicable; however, the Court must consider other pertinent factors which might nevertheless indicate that the employee is an administrator. The pertinent factors to be considered for administrative exemption are identical to the pertinent factors which are considered for executive exemption listed in the "time alone" caveat under 29 C.F .R. § 541.103, and this Court's earlier findings control.

Since Sack fails the "short test" for qualification as an administrator, described in 29 C.F.R. § 541(e)(2), this Court must now apply the "long test" described in 29 C.F.R.

§ 541.2(a-e). *Id* . The "long test" provides in pertinent part:

[t]he term *employee employed in a bona fide * * * administrative* * * * *capacity* in section 13(a)(1) of the Act [FLSA] shall mean any employee:

(a) Whose primary duty consists of either:

(1) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers, or ...

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in the regulations of this subpart), or

(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; and

(d) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

(e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week ...

32. The application of the "long test" is greatly simplified by virtue of the fact that several sections are identical to the "short test" analyzed above. Section 541(a) provides that a bona fide administrative employee is any employee whose primary duty consists of either the requirements contained in 29 C.F.R. § 541(a)(1) or 29 C.F.R. § 541(a)(2).[10] Section 541(a)(1) is identical to

**10.** 29 C.F.R. § 541(a)(2) applies to employees of educational institutions, and therefore is inapplicable.

the "short test" described in 29 C.F.R. § 541(e)(2), on which this Court already has ruled. Because Sack fails to meet the requirements of § 541(a)(1), this Court finds that Sack does not qualify as a bona fide administrative employee under the "long test ."

33. This Court has carefully considered Sack's activities and responsibilities during his tenure at Miami Helicopter. The Court has analyzed his work under both the executive and administrative exemptions provided by the Fair Labor Standards Act, 29 U.S.C. § 213, *et seq*, and the implementing regulations contained in 29 C.F.R. § 541, et seq. The Court has determined that under the applicable executive "short test," with consideration given to other pertinent factors, 29 C.F.R. § 541.1(f); the administrative "short test," with consideration given to pertinent factors, 29 C.F.R. § 541.2(e)(2); and the administrative "long test," 29 C.F.R. § 541.2(a-e), that Miami Helicopter has failed to meet its burden of establishing that Sack is an exempt employee. Thus, Sack is entitled to overtime compensation for those hours worked in excess of forty hours per week (which has been stipulated to be 374.8 hours.) *Stipulation*, § VI, ¶ 8. The Court now turns to the question of liquidated damages.

### *Liquidated Damages*

34. Under the FLSA "any employer who violates the provisions of [the Fair Labor Standards Act] shall be liable to the employee or employees affected in the amount of the ... unpaid overtime compensation ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The awarding of liquidated damages was mandatory until Congress amended the FLSA in 1947 to confer judicial discretion in this determination. The Portal–to–Portal Act now provides that a district court may, in its sound discretion, award either no liquidated damages or a reduced amount of liquidated damages. 29 U.S.C. § 260. The court's discretion is limited as follows:

(1) The employer must show to the satisfaction of the court that the act or omission giving rise to such action was in good faith; and (2) he must show also, to the satisfaction of the court, that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act.... If, however, the employer does not show to the satisfaction of the court that he has met the two conditions mentioned above, the court is given no discretion by the statute, and it continues to be the duty of the court to award liquidated damages.

29 C.F.R. § 790.22(b). "Section 11 of the Portal–to–Portal Act, 29 U.S.C. § 260, permits the judge to deny liquidated damages only if the employer shows its action was in good faith and there were reasonable grounds for believing the action was not a violation of the FLSA." *Barcellona v. Tiffany English Pub. Inc.*, 597 F.2d 464, 466 (5th Cir.1979). Thus, an employer is not relieved of liability even if he erroneously believes he conformed in good faith; "actual conformity [with the regulation, order, ruling, approval, interpretation (promulgated by the Department of Labor), administrative practice or enforcement policy] is necessary." 29 C.F.R. § 790.14(a). The employer also must show that he *actually* relied upon the regulation or its interpretation. 29 C.F.R. § 790.16.

35. The Eleventh Circuit has opined that in order to avoid liquidated damages under the FLSA, the "employer must plead and prove that the act or omission complained of was: (1) in good faith; (2) in conformity with; and (3) in reliance on an administrative regulation, order, ruling, approval or interpretation of an agency of the United States." *Olson v. Superior Pontiac–GMC, Inc.*, 765 F.2d 1570, 1579, *modified*, 776 F.2d 265 (11th Cir.1985). The test of whether or not an employer acted in good faith also has been interpreted to include the objective standard of whether the employer acted as a reasonably prudent person would have acted under similar circumstances. *Id.* at 1580 (internal citation omitted). The Eleventh Circuit has also approved of the Fifth Circuit's interpretation of the good faith requirement in *Barcellona*: "good faith requires some duty to investigate potential liability under FLSA. *Washington v. Miller*, 721 F.2d 797, 804 (11th Cir.1983) (internal citation omitted).

36. The President of Miami Helicopter, Mr. Di Gregorio, was aware that the FLSA regulations existed. No evidence was offered that Defendant made an effort to ascertain that the application of the FLSA regulations as to Sack was correct—perhaps due to the fact that Sack did not raise the issue with the President of Miami Helicopter during his employment. Mr. Di Gregorio testified that his decision that Sack would not be paid for overtime was based, in part, on the fact that the previous Director of Maintenance had not been paid overtime during the ten years of his employment with Defendant. In addition, Sack had responsibilities which required him to stay longer on some days, but provided some free time on other days. There was no evidence that Defendant actually relied on the regulation or any interpretation of the regulation; however, the Court cannot conclude that a reasonably prudent person would have acted differently under these circumstances. This Court finds that the employer acted in good faith and that the decision as to the applicability of the overtime pay requirements was not unreasonable. Despite this finding, controlling precedent suggests that liquidated damages must be awarded—because Defendant failed to meet the standard as described in *Olson.* The Court has identified several older, non-binding decisions which suggest that, in close cases, a court's discretion can be exercised so as to deny liquidated damages. *Peperissa v. Coren–Indik, Inc.,* 298 F.Supp. 34, 39 (E.D.Pa.1969) (proper to deny liquidated damages where employment was of a "border-line" nature between exempt executive and nonexempt employee); *Knudsen v. Lee & Simmons,* 89 F.Supp. 400, 406 (S.D.N.Y. 1949) (variable nature of the plaintiffs' employment made the defendant's error in not paying overtime a reasonable one). The decision that Plaintiff is entitled to overtime compensation under the present facts is a close one. This Court has undertaken a substantial review of the record and the applicable regulations—a task which reveals that the error in Defendant's decision was not immediately apparent. Although Defendant was not as familiar with the Act as it should have been; the complexities of the Act as to this determination suggest no ad-verse inference as to the Defendant—particularly in light of the size of the company and the nature of its business operations. Nevertheless, the law in this Circuit requires that liquidated damages be awarded.

37. To determine an appropriate amount of liquidated damages, the Court looks to the circumstances surrounding the Defendant's erroneous decision to treat Plaintiff as an exempt employee. As a preliminary matter, it must be noted that Plaintiff was aware of a change in his compensation shortly after commencing his employment with Defendant. The comptroller testified that Plaintiff approached her after he stopped receiving overtime pay during his initial few weeks with the company, and that she directed him to communicate any concerns about that change to Mr. DiGregorio. *Trial Testimony* (Escauriza). Plaintiff did not object to or complain to Mr. DiGregorio about the unpaid overtime wages until after he left his employment more than a year later and relocated to another state. *Trial Testimony* (DiGregorio, Sack). Such circumstances suggest that an award of substantial liquidated damages would be inappropriate. *White Star Manufacturing Co. v. Nicolle,* 403 F.2d 41(5th Cir.1968) (no abuse of discretion to award only $100 in liquidated damages in light of employee's failure to request overtime and because he did perform some supervisory functions); *White v. Beckman Dairy Co.,* 352 F.Supp. 1266, 1270 (W.D.Ark.1973) (discharged employee not entitled to liquidated damages in addition to overtime compensation, noting that he made no protest during his several years of employment). The amount of liquidated damages to be awarded reflects this Court's assessment of the nature of the error made by Miami Helicopter. As noted above, this was a close case and the employee himself did not complain to Defendant that he was entitled to overtime until after his departure (and after having been paid on a salary basis for more than one year by Defendant). As is evident from the above findings, there was a misinterpretation of the regulation allegedly providing an exempt status for Sack. The Court is required to award liquidated damages in light of Defen-

dant's failure to offer proof that it relied on an interpretation of the FLSA regulations. However, the circumstances of this case suggest that an award of $100 in liquidated damages is appropriate.

38. In conclusion, the Court has determined that Sack was a non-exempt employee of Miami Helicopter and, thus, is entitled to overtime compensation for those hours worked in excess of forty (40) hour work weeks during his tenure at Miami Helicopter. The parties have agreed in their Joint Pretrial Stipulation that if Sack was determined to be a non-exempt employee, he was owed $10,543.78 for unpaid overtime. Further, this Court has determined that the language of the applicable regulation requires an award of liquidated damages. The amount of liquidated damages shall be $100.

Based on the above, it is hereby

ORDERED AND ADJUDGED that judgment shall be entered on behalf of the Plaintiff. Plaintiff shall recover $10,543.78 for unpaid overtime, and an additional $100 in liquidated damages.